## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| JEAN-CLAUDE FRANCHITTI, on behalf of The UNITED STATES OF AMERICA, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 3:17-cv-06317 |
| COGNIZANT TECHNOLOGY SOLUTIONS CORPORATION and COGNIZANT TECHNOLOGY SOLUTIONS U.S. CORPORATION, | ) ) ) ) ) | |
| Defendants. | ) ) | |

Trial by jury demanded.

---

### FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

---

Pursuant to the *qui tam* provisions of the False Claims Act, 31 U.S.C. §§ 3729-3733, Plaintiff-Relator Jean-Claude Franchitti brings this *qui tam* Complaint on behalf of the United States of America against Defendants Cognizant Technology Solutions Corporation and Cognizant Technology Solutions U.S. Corporation (collectively "Cognizant") and alleges as follows:

### <u>NATURE OF THE ACTION</u>

1.      This action concerns Cognizant's egregious and widespread fraud against the United States in applying for and securing work visas.  Cognizant engages in visa fraud so that it

can import and employ cheap labor (primarily from India) in the U.S. and avoid having to employ higher-priced Americans.

2.      Cognizant's fraudulent scheme involves three types of visas:  H-1B, L-1, and B-1 visas.   With respect to each type of visa, Cognizant submits to the government fraudulent applications and supporting documents each falsified specifically to meet the requirements of the visa type Cognizant is seeking.  For example, in its visa applications and supporting documents, Cognizant falsely represents that: (a) jobs exist that visa recipients will assume and perform in the U.S.; (b) visa recipients will perform specific tasks, have managerial responsibilities, or have subject matter expertise; and (c) visa recipients will be paid a required salary in accordance with U.S. law.  In addition, Cognizant applies for cheaper visas for positions and work for which more expensive visa applications are required, which enables Cognizant to defraud the government out of its rightful application fees and also to avoid the legislative cap on the number of the more expensive visas the government awards annually.

3.      Cognizant's scheme has allowed it to grow and maintain a robust "travel ready" workforce in India comprised of employees who have been issued visas by the United States government without yet having any work in the country.  These employees are available to fill open U.S. jobs on a moment's notice, and at a meager wage, so that Cognizant can minimize employing Americans.  This practice has allowed Cognizant to reduce its own costs by employing cheap labor from India in the U.S. rather than having to pay higher American salaries.

4.      Each such "travel ready" employee represents a violation of law and several acts of fraud by Cognizant against the United States government.

5.      Cognizant's scheme has deprived the government of its interest in work visas, substantial visa application fees, and significant tax revenue in violation of 31 U.S.C. §

3729(a)(1)(A), 31 U.S.C. § 3729(a)(1)(B), and 31 U.S.C. § 3729(a)(1)(G).   Relator seeks to recover all damages, civil penalties, and other remedies available under the False Claims Act from Cognizant.

## THE PARTIES

6.     The Plaintiff in this action is the United States of America, by and through *Qui Tam* Relator Jean-Claude Franchitti.  Mr. Franchitti was born in France, is a permanent resident (green card holder) of the United States of America, and resides in the State of New York.

7.     Defendant Cognizant Technology Solutions Corporation ("CTSC") is an American multinational corporation that provides information technology and consulting services to corporate clients and is the parent company to Cognizant Technology Solutions U.S. Corporation. CTSC is a Delaware corporation (incorporated in 1988) and maintains its World Headquarters and principal place of business in Teaneck, New Jersey.  CTSC has 40 offices in the United States and employs approximately 54,000 employees domestically and 281,500 employees worldwide.

8.     Cognizant Technology Solutions U.S. Corporation was incorporated in 1996 and is also a Delaware corporation.  It operates as a subsidiary of CTSC and is headquartered in College Station, Texas.

9.     At all times relevant hereto, Cognizant conducted business in the State of New Jersey and submitted fraudulent visa petitions and supporting documentation in the State.

## JURISDICTION AND VENUE

10.     This action arises under the False Claims Act, 31 U.S.C. § 3729 *et seq.*

11.     Subject Matter Jurisdiction.  The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 3732(a) (False Claims Act) and 28 U.S.C. § 1331 (Federal Question).

12.     <u>Personal Jurisdiction</u>.  This Court has personal jurisdiction over the Defendants because they are located within the District of New Jersey, and regularly provide information technology and consulting services within this District.

13.     <u>Venue</u>.  Venue is proper in the District of New Jersey under 28 U.S.C. § 1391(b)-(c) and 31 U.S.C. § 3732(a) because Cognizant conducts business within this District, maintains its world headquarters within this District, and committed acts giving rise to this Action within this District, in violation of 31 U.S.C. § 3729.

## FACTUAL ALLEGATIONS

**A.    Cognizant's Business Model**

14.     Cognizant is an American company that predominately services clients located in the United States.  It earned $16.8 billion in revenue in 2019, 78% of which was derived from clients located in North America (almost all in the United States).

15.     American corporations rely on Cognizant to provide technology services in lieu of maintaining in-house IT personnel.  Cognizant's work for corporate clients is project-based, meaning a client will contract with Cognizant to perform specific tasks or projects.

16.     Cognizant competes for business based on price.  By minimizing its own costs for providing technological services, Cognizant is able to offer lower prices to clients and still earn a substantial profit.  Employee pay is Cognizant's primary cost in offering its services to U.S.-based clients.  If Cognizant can employ people who are willing to work for less, it can better compete for corporate clients and reap larger profits.

17.     India is a poor country with low salaries.  In the technology industry, Indians earn much less than Americans.  Thus, in order to reduce its costs of providing technology services in America, Cognizant has adopted a business model in which it mostly employs Indian citizens in

the United States for whom it has secured a visa, as these employees are paid a fraction of what American technology workers demand.

18.     The majority of Cognizant's United States workforce is comprised of Indian citizens.

19.     To work in the United States, Indian citizens require work visas issued by the federal government.   Cognizant applies for and secures three types of visas for its foreign workforce:  H-1B, L-1, and B-1 visas.

20.     <u>H-1B visas</u>.  H-1B visas are intended to bring foreign workers to the United States to perform services in specialty occupations when there are insufficient workers in the U.S. to perform a specific job.  *See* 8 C.F.R. § 214.2(h)(1)(ii)(B); 8 C.F.R. § 214(i)(1).  As part of each H-1B visa application, the petitioner must establish that an actual job at a specific location is available for the person for whom the company seeks the visa.  *See* 20 C.F.R. § 655.730(c)(4) (discussing required content of Labor Condition Applications that accompany visa petitions).  H-1B visa petitions cannot be filed for speculative or future work.  *See* PM-602-0157 at 4, U.S. CITIZENSHIP AND IMMIGRATION SERVICES (Feb. 22, 2018), https://bit.ly/2JoOxLn ("When a beneficiary will be placed at one or more third-party worksites, the petitioner must demonstrate that it has specific and non-speculative qualifying assignments in a specialty occupation for the beneficiary for the entire time requested on the petition.").

21.     In applying for an H-1B visa, Cognizant must submit a Labor Condition Application ("LCA") in which it attests that: (a) the job for which a visa is sought actually exists and (b) that Cognizant will pay the visa holder a "prevailing wage" (*i.e.*, at least as much as Cognizant pays American workers for the same work in the same geography).  *See id.*; 20 C.F.R. § 655.731(a).

22.     In addition to LCAs, the federal government will review other evidence submitted with the visa application to demonstrate that a job actually exists for the intended visa recipient, including letters setting forth job duties, qualifications, salary, supervisor, etc. of the H-1B worker. *See* Memorandum HQ70/6.2.8 AD 10-24 at 8, 16, U.S. CITIZENSHIP AND IMMIGRATION SERVICES (Jan. 8, 2010) (Ex. 1).  Cognizant submits such letters to the federal government, which are signed by purported managers of the visa beneficiaries, and refers to them as "invitation letters" or "manager letters." *See* Ex. 2 (compilation of Cognizant H-1B invitation letters).

23.     The United States government issues only 65,000 H-1B visas each year.  (An additional 20,000 H-1B visas are reserved for individuals with graduate degrees from American universities.)  The government awards H-1B visas through a lottery process, which is extremely competitive.  Companies can begin applying for H-1B visas on April 1 of a calendar year, and the government closes the application process once the H-1B cap is met.  The cap is generally met within the first five business days.  For example, in 2019, the H-1B filing period opened on April 1, and the United States Citizenship and Immigration Services ("USCIS") announced on April 5 that it had received sufficient H-1B visa petitions to reach the 65,000 cap.  In total, 190,098 H-1B visa petitions were received by USCIS during the 2019 filing period, and 65,000 H-1B visas were then awarded through a lottery.

24.     H-1B visas are awarded by the government in October.  Thus, it takes six months from the date on which an H-1B visa application is submitted to the government for its approval. The delay obtaining an H-1B visa need can far exceed this six month application-to-approval time frame considering that USCIS only accepts H-1B applications for a short window in April of each year.  Thus, H-1B needs that arises in May (or later) of a given year will have to wait roughly 1.5 years (until two Octobers hence) even to have a chance for an H-1B visa through the lottery

process.

25.    H-1B visa holders may work in the United States for a maximum initial stay of three years, followed by another three year extension, and then on a year-to-year basis for those visa holders seeking permanent U.S. residency.  H-1B visa petitions are submitted under penalty of perjury and cost $6,460 per application.[1]

26.    L-1 visas.  L-1 visas are intended for a substantially narrower range of work and workers than H-1B visas.  There are two types of L-1 visas:  L-1A and L-1B visas.  L-1A visas are only available for management-level employees – *i.e.*, those that principally supervise and control the work of other personnel, including the hiring, firing, and/or promotion of subordinate employees, or "if no other employee is directly supervised, [he or she must] function at a senior level within the organization hierarchy or with respect to the function managed."  *See* 8 C.F.R. § 214.2(l)(1)(ii)(B).  L-1B visas, on the other hand, are reserved for subject matter experts – *i.e.*, employees with "an advanced level of knowledge or expertise in the organization's processes or procedures."  *See* 8 C.F.R. § 214.2(l)(1)(ii)(D).  The L-1B petitioner "has . . .  [the] burden of demonstrating by a preponderance of the evidence that the beneficiary's knowledge or expertise is special or advanced, [] that the beneficiary's position requires such knowledge[, and] that qualities of [the company's] own processes or products require this employee to have knowledge beyond what is common in the industry."  File No. [REDACTED] at 8-9, U.S. CITIZENSHIP AND IMMIGRATION SERVICES (Oct. 14, 2014), https://bit.ly/3p19MCl.

27.    As with H-1B visas, an L-1 visa applicant is required to provide detailed documentation in support of the application.  And as with its H-1B applications, Cognizant

---

[1] *See* H and L Filing Fees for Form I-129, Petition for a Nonimmigrant Worker, U.S. CITIZENSHIP AND IMMIGRATION SERVICES (last accessed Jan. 27, 2021), *available at* https://bit.ly/3qp3qhg (listing $460 filing fee, $1,500 American Competitiveness and Workforce Improvement Act fee, $500 Fraud Prevention and Detection fee, and $4,000 fee pursuant to Pub. L. 114-113).

supports L-1 visa applications with invitation letters describing jobs that L-1 visa recipients will fill.  *See* Ex. 3 (compilation of Cognizant L-1 invitation letters).

28.     Given the limited scope of work for which an L-1 visa can be awarded, the government has no cap on the number of L-1 visas it issues each year.  L-1 visas also do not have a prevailing wage requirement like H-1B visas.  L-1 visa holders may work in the United Sates for a maximum initial stay of three years, which may be extended once (for L-1B visas) or twice (for L-1A visas) in increments of two years.  L-1 petitions are also submitted under penalty of perjury and cost $5,460 per application ($1,000 less than an H-1B visa application).[2]

29.     <u>B-1 visas</u>.  The B-1 visa is a short-term visitor visa that allows a foreign national to temporarily enter the United States for limited business purposes, such as attending a business meeting or conference, negotiating a contract, or participating in short-term training.  B-1 visa holders may not perform skilled or unskilled labor while in the United States.  *See* 8 U.S.C. § 1101(a)(15)(B); 9 Dep't of State, Foreign Affairs Manual § 402.2-5(A) (May 13, 2019).  As such, B-1 visa holders are prohibited from performing *any* billable client work for their employer while in the U.S.

30.     A B-1 visa applicant may be required to provide detailed documentation in support of the application, such as evidence of his or her employment with the petitioner and the purpose of the business trip.  As with its H-1B and L-1 visa applications, Mr. Franchitti understands that Cognizant supports its B-1 applications with invitation letters describing the business purpose of the B-1 employee's visit to the U.S.

---

[2] *See* H and L Filing Fees for Form I-129, Petition for a Nonimmigrant Worker, U.S. CITIZENSHIP AND IMMIGRATION SERVICES (last accessed Jan. 27, 2021), *available at* https://bit.ly/3qp3qhg (listing $460 filing fee, $500 Fraud Prevention and Detection fee, and $4,500 fee pursuant to Pub. L. 114-113).

31.     B-1 visas cost $160 per application ($6,300 less than H-1B applications), and can be applied for and obtained year-round.[3]

**B.     Relator Jean-Claude Franchitti**

32.     Relator Jean-Claude Franchitti was hired by Cognizant in April 2007.  He worked as a Director for Cognizant's Advanced Solution Group, Cloud Convergence Group, and Global Technology Office ("GTO") business units.  Mr. Franchitti was promoted to Assistant Vice President in 2011.  He worked out of Cognizant's global headquarters located at 500 Frank W. Burr Boulevard in Teaneck, New Jersey and also worked remotely from his home office in New York.

33.     As an Assistant Vice President, Mr. Franchitti served as a key member of Cognizant's management team and oversaw more than 250 employees throughout the years.  Mr. Franchitti last reported to Raj Bala, Chief Technology Officer and Senior Vice President of GTO, and Mark Livingston, Executive Vice President and Head of Cognizant's Business Consulting group.

**C.     Cognizant's Fraudulent Scheme**

34.     Cognizant's business model is predicated on being able to use cheap foreign labor to staff client needs in the United States.  Its ability to source labor with U.S. visas is core to its business, and Cognizant recognizes that any "increased regulation, policy changes or administrative burdens of immigration, work visas or outsourcing" could reduce its profitability.[4]

35.     The United States visa system, though, is not designed to enable large-scale reliance on visa workers, much less visa workers who will accept a fraction of the pay demanded by

---

[3] *See* Fee for Visa Services, UNITED STATES DEPARTMENT OF STATE – BUREAU OF CONSULAR AFFAIRS (last accessed Jan. 27, 2021), *available at* https://bit.ly/3o71eZf.

[4] *See* Annual Report 2019 at 9, COGNIZANT (last accessed Jan. 27, 2021), *available at* https://bit.ly/3cegxgq.

Americans.  For starters, only H-1B visas are generally available for the type of work Cognizant needs to service clients in the U.S. – *i.e.*, nuts-and-bolts, day-to-day IT project work for which clients pay Cognizant.  But H-1B visas are in limited supply, are difficult to secure given the competitive lottery process by which they are awarded, and have prevailing wage requirements that far exceed what Cognizant pays its foreign employees for whom it seeks visas.

36.     In addition, it takes a long time to secure visas – not just H-1B visas (which take between 6 months and 1.5 years to receive after a visa need first arises), but also L-1 and B-1 visas. Cognizant thus has to take the time to prepare paperwork, collect documentary evidence (such as invitation letters), and wait for government review of the paperwork before learning the fate of individual visa applications.  And visa approval is always uncertain.  Sometimes the government will ask for additional supporting documentation (referred to as Requests for Evidence or "RFEs") before making a visa decision, and the government could always deny a visa application.  And H-1B visa applications, of course, must go through the competitive lottery process, such that Cognizant can only expect to receive a fraction of the H-1B visas for which it applies.

37.     In servicing clients in the U.S., Cognizant does not have the luxury of time or uncertainty because as soon as it secures a client's business, Cognizant must have staff available to fulfill the client's service needs.  Otherwise, Cognizant risks losing the business altogether.

38.     Given these pressures, Cognizant has elected to engage in a vast visa fraud scheme to create a cheap foreign workforce to whom visas have been issued by the U.S. government when the purported jobs or work against which the visas were issued do not in fact exist.  As a result of this scheme, Cognizant's visa holders are free to travel to the U.S. to perform future work when it becomes available, relieving Cognizant of the burden of having to hire or staff its client's project with more expensive Americans.

39.    The fraudulent scheme was structured by "higher ups" at Cognizant to deceive.  In an October 9, 2011 email announcing the scheme to onsite managers (including Mr. Franchitti), Vijayalakshmi Vema, a member of GTO's Corporate Offshore team, asked that the managers assist in "initiat[ing] [] visa petitions for travel to US" of employees located "offshore" by providing the onsite managers' contact information to be included in visa forms.  *See* Email from V. Vema to J.C. Franchitti (Oct. 9, 2011) (Ex. 4).  Onsite manager contact information was needed because Cognizant would routinely apply for visas for future, prospective work – not any existing work – and a U.S. manager needed to cover for the company if a federal officer were ever to inquire as to the legitimacy of the visa, as follows:

> ***Since many a times, the visa petition is filed proactively (without know-how of the project that the associate might travel for in the future), we needed a point of contact from GTO US who is permanently or semi-permanently located in the US.*** It seems that in 1 in 100 or 200 cases, the officer evaluating the petition is within his rights to call up the onsite manager and confirm whether he is aware that the specific associate has filed a petition.
>
> . . .
>
> ***After speaking extensively with [Global Immigration Team] higher ups, they recommend that it is a normal practice*** that somebody from the vertical/horizontal offers to support this.  Kindly confirm and let me know your full residential address.

*Id.* (emphasis added).

40.    Cognizant refers internally to foreign workers who have been issued a visa without any work available in the U.S. as being "travel ready" – *i.e.*, available to travel to the U.S. on a moment's notice to perform work when it becomes available in the future.  *See, e.g.*, Excerpt from H1B Cap 2015 – Center of Excellence ("COE") Quota Analysis (Ex. 5) (identifying 72 "Travel Ready Associates" in GTO in 2013); Email from V. Vema to CoE Leadership & GTO Leads (Feb. 17, 2012) (Ex. 6) (identifying 15 "Travel ready . . .  associates in GTO" who had never traveled to the U.S. and providing a timeline of the aging of their visas); Excerpt from Travel Ready Report

11

(Sept. 1, 2015) (Ex. 7) (listing 18 "travel ready" H-1B associates and 20 travel-ready L-1 associates whose work permits were filed in 2013, 2014, and 2015); Email from J.C. Franchitti to P. Ershler (Oct. 11, 2012) (Ex. 8) (identifying offshore employee who is "travel ready and can take up short term – midterm onsite engagements" and noting that another position "is being filled by the Offshore LM team with a travel ready resource"); Emails from P. Ershler to S. Pisipati, *et al.* (Nov. 1, 2013) (Ex. 9) (proposing three architects who "[a]ll are Off-shore, and all are travel ready" for onsite positions and noting they "all have valid visa's [sic] and can travel as soon as we have an allocation for them"); Email from S. Devanathan to J.C. Franchitti, *et al.* (Oct. 17, 2013) (Ex. 10) (attaching profiles of four L-1 visa holders who are "travel ready at offshore" and available for onsite role).

41.     Cognizant executives made clear to Mr. Franchitti that he was required to help ensure that Cognizant's foreign employees secured visas for future U.S. work:

> As discussed, it would be beneficial for you (JC, Phil) to address the team to explain the strategy regarding visa-readiness for potential US opportunities.  The message to the team has been that the idea is to get associates visa-ready, so if a suitable opportunity arises in the US we can move quickly.

Email from P. Saint to J.C. Franchitti, *et al.* (May 21, 2013) (Ex. 11).

42.     While Mr. Franchitti oversaw a team of around 30 employees in the U.S. who were part of Cognizant's Global Technology Office ("GTO"), Cognizant often maintained more than 50 "travel ready" GTO associates offshore available to staff U.S. positions. *See* GTO – Travel ready – Unutilized PowerPoint at 2-3 (Mar. 24, 2015) (Ex. 12)  (noting "51 associates based at offshore have visas to travel to US" as part of "GTO's Immigration readiness" and that "67% of [Cognizant's] travel ready associates have NEVER TRAVELLED"); Excerpt from H1B Cap 2015 – Center of Excellence ("CoE") Quota Analysis (Ex. 5) (listing 72 "Travel Ready Associates" in GTO in 2013).

43.     Mr. Franchitti was also instructed that actual jobs or work need not be available to secure visas, as Cognizant's Immigration group simply wanted to ensure that visa paperwork was processed to allow employees to be available to travel for future work:

> Per our conversation with [Cognizant's] Immigration [group] last week, they told us we did not have to identify a project for each person to get a visa that would be good for 3 years.  We are not assigning anyone to any project at this time.  We are just processing the paperwork, and obtaining the visas so that team members are travel ready ASAP.

Email from P. Ershler to G.  Humphreys, *et al.* (Apr. 17, 2013) (Ex. 13); *see also* Email from P. Ershler to S. Chakraborty, *et al.* (May 6, 2016) (Ex. 14) (instructing transfer to his team to "[p]lease start working on getting yourself travel ready to come to the US. While I don't have any specific openings for you at this time, we are constantly being asked for Manager Level architects . . . [and] we can find an opportunity for you when you are ready to travel").

44.     Cognizant's scheme involves three types of fraud:  (i) falsification of jobs and work for which visas are sought; (ii) applying for L-1 and B-1 visas for work for which an H-1B visa is required (thereby reducing the amount paid to the federal government in visa application filing fees); and (iii) failing to pay H-1B visa recipients required salaries (thereby saving on employee costs and reducing federal taxes paid).

**i.     Falsification of Jobs and Work**

45.     Cognizant falsifies jobs (and work) for which visas are sought.  Fake jobs and job duties are identified in visa applications, including in invitation letters submitted to the government as evidence that the jobs for which visas are sought actually exist in the U.S.  This practice occurs throughout the organization, and executives within various business units are asked by Cognizant to sign invitation letters identifying jobs that do not exist, per the "proactive" process Cognizant announced in 2011.

46.     Mr. Franchitti was one of a number of executives directed to sign fraudulent invitation letters.  The invitation letters are generally replete with false representations concerning the work visa recipients would be performing in the U.S.  Exhibits 2 and 3, incorporated herein by reference, are examples of invitation letters Mr. Franchitti signed for employees who – notwithstanding representations in the letters – Mr. Franchitti did not know and who never reported to him onsite.  In all, Mr. Franchitti signed hundreds of such letters during his tenure with the company.

47.     The invitation letters are pure fiction.  Take, for example, a November 13, 2013 letter Mr. Franchitti was required to sign in support of an L-1B visa application for Pradeep Kumar Reddy Atmakur, an employee who he did not know and never met.  *See* Ex. 3 at 16-17.   The letter falsely claimed that, "[w]hile in the U.S., Mr. Atmakur will report to me, Jean-Claude Franchitti, his immediate supervisor."  *Id.* at 16.  L-1B visas are difficult to secure, as they are only available to subject matter experts who have specialized knowledge that is "distinguished, noteworthy, or uncommon."[5]  Accordingly, Cognizant had Mr. Franchitti falsely attest to Mr. Atmakur's expertise on a project of which Mr. Franchitti was completely unaware, as follows:

> As Assistant VP-Consulting, I have firsthand knowledge of the Cognizant project which Mr. Atmakur will be assigned to in the U.S. and attest that only an individual who has acquired advanced specialized knowledge through a combination of Cognizant overseas on-the-job and Cognizant Academy classroom training of Cognizant's proprietary methodologies can processes, Cognizant's GTO, and Cognizant's vertical and horizontal concepts, would be able to perform the job duties for this project.

Ex. 3 at 16.

48.     Similarly, Mr. Franchitti was directed to sign a January 14, 2015 invitation letter in support of an H-1B visa application for Sakthivel Murugasamy, falsely claiming that Mr.

---

[5] *See* File No. [REDACTED] at 6-7, U.S. CITIZENSHIP AND IMMIGRATION SERVICES (June 19, 2014) https://tinyurl.com/y26eogt9.

Murugasamy would report directly to Mr. Franchitti and perform a job that Mr. Franchitti did not know existed. *See* Ex. 2 at 1-2.

49.     Mr. Franchitti and other executives complained about the fraudulent nature of Cognizant's invitation letters, including Aaron De Los Reyes (Senior Director in Cognizant's Oracle Practice), Allen Saheen (Head of Cognizant's Enterprise Application Services), and Joseph Tobolski (who took over Mr. Franchitti's letter signing responsibilities after he complained to Cognizant about this fraudulent practice). Cognizant dismissed these complaints and, in the case of Mr. Franchitti, simply transitioned the letter signing responsibilities away from him.

50.     Specifically, in 2014 and 2015, Mr. Franchitti repeatedly raised concerns with his manager, Raj Bala, regarding Cognizant's fraudulent invitation letter scheme, complaining that job-related representations in the letters were false. In response, Cognizant ultimately transferred the invitation letter signing responsibility to Joseph Tobolski who oversaw the Global Technology Incubation ("GTI") team at Cognizant. Cognizant instructed that Mr. Tobolski sign invitation letters not only for GTI, but also for Global Technology Consulting ("GTC") – the group managed by Mr. Franchitti. Mr. Franchitti complained that it was inappropriate for Mr. Tobolski to sign letters concerning employees who worked offshore in the GTC group, as these individuals would never report to Mr. Tobolski:

> The GTC and GTI letters should be handled as part of two different threads. There are a[t] least two good reasons to handle things this way: (a) the letters make a representation to US immigration officials as to the actual onsite manager for resources who are being granted H1B visas. (b) in general, non-GTI resources [i.e., GTC workers] are not managed by Joe at onsite.
>
> …
>
> I do not see the point you are trying to make when you state that "this activity is more of an administrative work" and "Joe has joined us for a senior position and he has also agreed to sign the letters". Who signs the letters is irrelevant here**, *the question is who should sign them given our current business context and to make proper representation to immigration officials.***

*See* Email from J.C. Franchitti to V. Vema, *et al.* (Feb. 27, 2015) (Ex. 15) (emphasis added).

51.     Mr. Tobolski subsequently complained to Mr. Franchitti regarding the fraudulent nature of the invitation letters, as he too was required to sign invitation letters and approve visas for employees for whom there was no work currently available in the U.S.  For example, in January 2015, Mr. Tobolski was asked to approve an L-1A blanket submission request for offshore employee Viswanathan Iyer.  *See* Email from V. Iyer to V. Ramasubramanian & J. Tobolski (Jan. 12, 2015) (Ex. 16).  When Mr. Tobolski pushed back on the request, he was told that Mr. Iyer's visa was being processed for future work and that no U.S. position was currently available for the associate:

> Hi Joe, As part of GTO travel-readiness, I'd initiated my "L1-A Blanket Visa for Self & Dependents"  processing.  This requires an internal US Project ID (in the absence of a client assigned project).  The Peoplesoft project ID used by GTO associates is  "1000006471 GTO Corporate US", which is why this has come to your queue.  For this year, this could be the first such request raised.  Please note that my actual cost of travel (or that of my dependents, if at all they travel) will NOT go against this project.  When I raise a travel request, it will be against a client specific project id.
>
> …
>
> The stamping cost will be borne by the "1000105868 GTO BT Consulting APAC" project.  The US project is required since there is no US client centric project mapped for the GTO associate.

Emails from V. Iyer to J. Tobolski & V. Ramasubramanian (Jan. 13, 2015) (Ex. 16).  This type of request was referred to as "a normal part of the visa process" which "JC [Franchitti] used to get" before the visa responsibility was transferred to Mr. Tobolski.  Email from V. Ramasubramanian to J. Tobolski, *et al.* (Jan. 16, 2015) (Ex. 16).

**ii.     Applying for L-1 and B-1 Visas in Lieu of H-1B Visas**

52.     H-1B visa applications ($6,460) are substantially more expensive than L-1 applications ($5,460) and B-1 applications ($160), and H-1B visa applications are subject to the

time consuming, highly competitive, and highly uncertain lottery process.  Accordingly, as part of its "travel ready" visa process and to reduce visa application fees, Cognizant fraudulently seeks L-1 and B-1 visas for employees who ultimately perform work for which H-1B visas are required.

53.     Specifically, Cognizant applies for L-1 visas simply to have foreign employees "travel ready" to perform H-1B work.  L-1 visas are exceedingly limited in scope, particularly compared to the scope of work allowed under H-1B visas.  L-1A visas, for example, require that an actual job exist in which a prospective visa recipient primarily supervises and controls the work of others, as compared to completing technical client project work.  *See* 8 C.F.R. § 214.2(l)(1)(ii)(B).  L-1B visas are only available to individuals with highly specialized, uncommon knowledge within Cognizant, and the position for which the visa is sought must require such knowledge.  *See* 8 C.F.R. § 214.2(l)(1)(ii)(D).  These narrow visa categories, however, do not deter Cognizant from "proactively" seeking L-1 visas for employees who, after visa issuance, travel to the U.S. perform H-1B work once a job materializes.

54.     For example, in L-1 invitation letters, Cognizant simply fabricates roles and responsibilities of employees, claiming that the fake jobs are either managerial or specialized in nature.  Sometimes the exact same position – *e.g.*, Principal Architect – will be described as managerial and thus appropriate for an L-1A visa in one application, and specialized and thus appropriate for an L-1B visa in another application.  *See* Ex. 3 at 3-4 (September 22, 2014 L-1A invitation letter for Krishna Hebbar); *id.* at 10-13 (February 15, 2016 L-1B invitation letter for Nageswara Rao Ravuri).  Other times the fake jobs (and job duties) are vaguely defined to fit the management and specialty requirements of L-1 visa holders – *e.g.*, "Manager" (L-1A letter) and "Technology Specialist" (L-1B letter).  *See id.* at 14-15 (January 15, 2014 L-1A invitation letter for Parthasarathi Jinka); *id.* at 16-17 (November 13, 2013 L-1B invitation letter for Pradeep Kumar

Reddy Atmakur).  L-1 invitation letters signed by Mr. Franchitti often conclude with a blanket

form attestation that had no basis in fact, as follows:

> *L-1A Letter*:  "In sum, I attest that Mr. Madhusudan Hanumantha Rao's role as Senior Manager-Consulting will be managerial, and is crucial to ensuring the continued success and leadership of our company."

> *L-1B Letter*:  "In sum, I attest that Mr. Mohan R's role as Senior System Analyst is specialized knowledge role, and is crucial to ensuring the continued success of our company."

*See id.* at 6, 7.

55.     Once L-1 visas are issued against Cognizant's fraudulent visa applications, L-1

visa holders then wait for work to materialize in the U.S.  Once an open position is identified, L-1

visa holders then travel to the country to perform work for which H-1B visas are required, not L-

1 visas.  For example, Cognizant secured an L-1A visa for Sathish Kumar Muthukaruppan.  Mr.

Muthukaruppan reported to Mr. Franchitti.  While reporting to Mr. Franchitti, Mr. Muthukaruppan

worked as a Lead Enterprise Architect and as one of 5 employees working full-time onsite at World

Bank Group (the client) performing project work; that is, he was performing technical work to

service the client.  Cognizant routinely seeks H-1B visas for such architect roles, as the jobs entail

client service fulfillment. *See, e.g.*, Ex. 27 (H-1B invitation letter for Director and Chief Architect

who "will work as the lead from Cognizant's Life Sciences Enterprise Architecture Practice"); Ex.

28 (H-1B invitation letter for Enterprise Architecture Tools Practice Lead); Ex. 29 (H-1B

invitation letter for Principal Architect in Cognizant's Enterprise Architecture Practice); Ex. 30

(H-1B invitation letter for Enterprise Architect). Mr. Muthukaruppan's position was not

appropriate for an L-1A visa, which Cognizant apparently knew, as it falsified Mr.

Muthukaruppan's job and duties in an invitation letter it directed Mr. Franchitti to sign to secure

an extension for Mr. Muthukaruppan's L-1A visa.  *See* Ex. 17 (May 22, 2015 L-1A invitation

letter).  Specifically, contrary to the statements made in the invitation letter, Mr. Muthukaruppan did not manage 45 consultants, did not manage any Service Oriented Architecture consulting practice (no such practice existed), and worked as a "Lead Enterprise Architect" as opposed to filling a "Director – Consulting" role.  *See id.*

56.     As part of its "travel ready" initiative, Cognizant has also sought and received B-1 visas to enable foreign employees to travel to the U.S. to perform work for which H-1B visas are required.  B-1 visas are only available for non-billable, short-term business activities such as attending a conference/training or negotiating a contract; they are not available to perform billable client work.  Nonetheless, once Cognizant secures B-1 visas for employees, it has them travel to the U.S. to perform paid client work that requires an H-1B visa.

57.     For example, as discussed above, Cognizant routinely seeks H-1B visas for enterprise architect positions.  *See* ¶ 55, *supra*; Exs. 27-30.  When H-1B visa holders are not available to fill these jobs, it opens the roles up to B-1 visa holders so that they can travel to the U.S. and perform architecture work.  *See, e.g.*, Email from S. Nandakumar to V. Ramasubramanian (Feb. 11, 2011) (Ex. 18) (noting for 3-4 month enterprise architect role "at D&B US[,] . . . [i]f the person only have [sic] business visa we can work with D&B on a model for the person to work in US for initial weeks and continue the work from offshore for the remaining period."); Email from K. Jayarajan to J.C. Franchitti, *et al*. (Oct. 11, 2012) (Ex. 19) (seeking to staff "an immediate position at NJ starting tomorrow" for an enterprise architect role and advising that for the position "[w]e can also look at folks having B1 (Not preferred) coming over here for duration of 8 weeks if that is the only option available"); Email from A. Sengupta to N. Keerampilly, *et al*. (June 27, 2014) (Ex. 20) (summarizing client call and specifying "Account is OK to have someone from offshore [for enterprise architect consulting role].  Someone from B1 might also work.").

### iii.   Underpayment of  H-1B Visa Workers

58.     In order to obtain an H-1B visa, Cognizant must certify to the government that, once an H-1B visa holder is in the United States, Cognizant will pay the employee at least as much as it pays Americans performing the same work in the same geography.  *See* 20 C.F.R. § 655.731(a).  But Cognizant's wage certifications – made under penalty of perjury – are false and fraudulent.  It has no intention of paying H-1B visa workers as much as Americans, as H-1B visa workers are willing to work for much less than their American counterparts.  In fact, Cognizant's H-1B visa workers are paid substantially less (approximately 20% to 30% less) than employees who do not require visas and perform the same work.

59.     Cognizant underpays its H-1B visa workers to cut costs, increase its margins on client projects, and to make visa workers more appealing to clients as a low-cost option for staffing.  *See, e.g*., Email from S. Devanathan to J. Gangadharan, *et al.* (June 26, 2014) (Ex. 21) (explaining, where client's rate was too low, that the Cognizant employee should "look at placing someone available from offshore who would be travel ready and feasible for the rate").

60.     For example, in the fall of 2014, Cognizant provided its client World Bank Group with a project proposal that was designed to provide a "flex" model where visa workers would travel to the U.S. on-demand to support surges in the number of Enterprise Architecture projects at World Bank.  In that case, Cognizant used a fixed-fee, multi-tier billing model that was appealing to World Bank because of the lower costs associated with the use of visa workers.  Cognizant, in turn, was able to make more profit by paying its H-1B visa workers less than their peers who did not require visas.  Under this model, Cognizant was required to consistently staff the new project openings with lower-cost H-1B visa workers, as local, visa-independent resources'

salaries were considerably higher and did not comport with the fixed-fee model agreed to by World Bank.

61.     During Mr. Franchitti's tenure with Cognizant, a number of H-1B visa workers complained to him and other managers about Cognizant's salary underpayment.  For example, H1-B visa worker Rajesh Sisodia (Associate Director) complained to Mr. Franchitti that he was paid less than a lower-level colleague (a Senior Manager) who joined at onsite two years after him. After investigating his concerns, Cognizant confirmed that Mr. Sisodia's salary was "significantly lower" than his peer group (including non-visa holders), and that his salary fell right at the 25th percentile for workers in the same practice and job level.  *See* Email from K.  Sinha to K.  Javeri (May 17, 2016) & Email from K. Javeri to J.C. Franchitti, *et al.* (May 17, 2016) (Ex. 22).  In addition, H-1B visa worker Debottam Roy complained that his salary was 15% lower than lesser experienced associates both within and outside of the GTO practice.  *See* Email from S. Muthukaruppan to J.C. Franchitti (Apr. 1, 2016) (Ex. 23).  After pulling his salary information, Cognizant informed Mr. Franchitti that Mr. Roy's salary fell below the 25th percentile of base salaries of employees in the GTO practice at the same job level, most of whom were visa-independent employees.  *See* Email from K. Sinha to J.C. Franchitti, *et al.* (May 20, 2016) (Ex. 23).  While Mr. Franchitti raised the underpayment issue with Kushali Javeri, a member of Cognizant's Human Resources department, Cognizant did not remedy its fraudulent practice.

62.     Cognizant's underpayment of H1-B visa workers is perpetuated by the company's practice of securing visa extensions for these individuals to keep them in the United States as long as possible, often by transferring the workers to new client projects as they become available.

**D.     Harm to the Government from Cognizant's Fraudulent Visa Practices**

63.     The government has suffered three distinct types of harm from Cognizant's fraudulent visa practices.  First, Cognizant's practice of creating "travel ready" visa holders by fraudulently obtaining visas has deprived the government of its interest in the fraudulently-obtained visas and its interest in controlling the distribution of such visas according to law.  For example, by law, H-1B and L-1 visas may not be awarded for speculative or future work, and Cognizant's fraudulent acquisition of these visas has deprived other foreign nationals the ability to legally work in the U.S.

64.     Second, Cognizant has improperly applied for thousands of L-1 and B-1 visas in lieu of applying for H-1B visas to perform work for which H-1B visas are required.  Each such fraudulent L-1 visa application deprives the government of $1,000 in filing fees, and each such fraudulent B-1 visa application deprives the government of $6,300 in filing fees.  Thus, the government has lost significant visa application revenue as a result of this fraudulent practice.

65.     Third, Cognizant's underpayment of its H-1B visa workers has deprived the U.S. government of significant tax revenue.  Specifically, by failing to pay its H-1B employees the required prevailing wage, Cognizant has reduced the amount of federal payroll tax it otherwise would have been required to pay the federal government.  Having falsely misrepresented on visa applications that it would pay H-1B visa employees the required prevailing wage, Cognizant has successfully reduced its federal tax payments without any misrepresentation to or fraud on the Internal Revenue Service ("IRS").  That is, by paying H-1B visa holders less than the required prevailing wage, the IRS and tax laws, faithfully obeyed, simply required less of a contribution from Cognizant than would have been required had Cognizant paid H-1B visa holders what it told the federal government it would pay.  The IRS requires an employer to contribute 7.65% of each U.S. employee's salary in payroll taxes.  By underpaying H1-B employees on the order of 20% to

30% of their salaries, the federal government's tax receipts on that required 7.65% was lower by the very operation of the tax laws.

**E.    Materiality of Cognizant's Visa Fraud.**

66.    Cognizant's visa fraud is material in at least two ways.

67.    First, Cognizant's fraudulent scheme has been wildly successful.  Between 2013 and 2019, Cognizant was the largest H1-B visa recipient each year and received more than 115,000 H-1B visas, visa extensions, and visa amendments over this period, surpassing the total of any other H-1B recipient by more than 50,000.  *See* USCIS Approved H-1B Petitions Data Excerpt FY 13-19 (Ex. 24).  Cognizant has also received almost 4,800 new or continuing L-1 visas over the past six years, and is often the second-largest recipient of L-1 visas from the federal government annually.  *See* USCIS Approved L-1 Petitions Data Excerpt FY 14-19 (Ex. 25).  (Data on the number of B-1 visas Cognizant has received is not publicly available.)  This widespread fraud on the part of Cognizant is consistent with Cognizant executives' prior efforts to circumvent the law to benefit the company.[6]

68.    Second, absent Cognizant's false representations to the federal government, Cognizant's visa applications would have been denied (discussed below) and Cognizant otherwise would have paid substantially more in visa application fees (in applying for H-1B visas in lieu of fraudulent L-1 and B-1 visas).

69.    **Cognizant's Invention of Fictitious Jobs and Work to Support Visa Applications:**  Cognizant's scheme to use false invitation letters (and representations) to petition for visas against fake jobs and work is critical to Cognizant's receipt of visas, since the government

---

[6] *See* SEC Charges Cognizant and Two Former Executives With FCPA Violations,  U.S. SECURITIES AND EXCHANGE COMMISSION (Feb. 15, 2019), https://www.sec.gov/news/press-release/2019-12; Release No. 42021, U.S. SECURITIES AND EXCHANGE COMMISSION (Feb. 15, 2019), https://www.sec.gov/litigation/admin/2019/34-85149.pdf.

consistently denies visa petitions for speculative or future jobs and work – i.e., when the petitioner fails to demonstrate actual employment for the beneficiary in the U.S. at the time of the visa filing. As reflected in decisions issued by the Administrative Appeals Office ("AAO") of USCIS, petitions for speculative work that are supported by fraudulent invitation letters such as those utilized by Cognizant (or other fraudulent materials) will be denied. *See, e.g.*, WAC 07 149 52522 at 2, 4, U.S. CITIZENSHIP AND IMMIGRATION SERVICES (July 31, 2009), https://tinyurl.com/y63c6dtw (affirming denial of visa application where petitioner's letter and supporting evidence was "insufficient to establish eligibility for the benefit sought" and "no bona fide position" existed for the beneficiary at the time of the visa filing); MATTER OF S-S-, INC. at 5, U.S. CITIZENSHIP AND IMMIGRATION SERVICES (Dec. 9, 2015), https://tinyurl.com/y5w4mhps (affirming denial of H-1B petition where the petitioner failed to establish that "the petition was filed for non-speculative work for the Beneficiary that existed as of the time of the petition's filing" and there was "insufficient documentary evidence in the record corroborating the availability of work for the Beneficiary for the requested period of employment"); *see also* Chart of USCIS Non-Precedent Decisions at 1-9 (Ex. 26) (listing examples of USCIS's denial of visa petitions for fake positions or speculative work).

70.     **Cognizant's Application for L-1 Visas in Lieu of H-1B Visas:** Cognizant's misrepresentations to the government about the purported work an employee will perform once in the U.S. on an L-1 visa is material to its receipt of both L-1A and L-1B visas. This is because USCIS consistently denies L-1A visa petitions where the petitioner fails to establish that the beneficiary will perform managerial work in the U.S. *See, e.g.*, In Re: 15276970 at 4-5, U.S. CITIZENSHIP AND IMMIGRATION SERVICES (Jan. 14, 2021), https://tinyurl.com/y6qkkqyy (upholding denial of L-1A petition where "Petitioner ha[d] not provided sufficient evidence

demonstrating that the Beneficiary will be employed in a managerial capacity" and documents indicated that the Beneficiary would be involved in operational tasks for the company in the U.S.); File No. [REDACTED] at 7-8, U.S. CITIZENSHIP AND IMMIGRATION SERVICES (Sept. 8, 2014), https://tinyurl.com/yxleuthl (dismissing appeal of denial of L-1A petition based on "the lack of specificity and the additional nonqualifying duties included in the beneficiary's resume [which] raise[d] questions as to the beneficiary's actual day-to-day responsibilities" and whether the beneficiary would be performing both managerial and non-managerial duties in the U.S.); File No. [REDACTED] at 6, U.S. CITIZENSHIP AND IMMIGRATION SERVICES (Aug. 28, 2015), https://tinyurl.com/yxkaxt27 (finding "the petitioner ha[d] not established that the beneficiary will be employed in a qualifying managerial or executive capacity" and denying L-1A petition where only "vague job responsibilities" were provided for the beneficiary, and "[t]he actual duties themselves [were needed to] reveal the true nature of the employment").

71.    Similarly, L-1B petitions that fail to satisfy the "specialized knowledge" requirement are also rejected by USCIS. *See, e.g.*, In Re: 13856515 at 5-6, U.S. CITIZENSHIP AND IMMIGRATION SERVICES (Jan. 7, 2021), https://tinyurl.com/y5l4keoc (upholding denial of L-1B petition where "the Petitioner ha[d] not established that the Beneficiary's formal education and experience with the foreign entity resulted in knowledge that is either special or advanced"); File No. [REDACTED] at 8-9, U.S. CITIZENSHIP AND IMMIGRATION SERVICES (June 19, 2014) https://tinyurl.com/y26eogt9 (dismissing appeal of L-1B denial where "the petitioner ha[d] not . . . . demonstrate[d] that [the beneficiary's] knowledge [wa]s uncommon or advanced" and noting that "[c]laiming . . . the beneficiary ha[d] technical knowledge of complex equipment is not sufficient to establish that he possesses specialized knowledge"); File No. [REDACTED] at 11, U.S. CITIZENSHIP AND IMMIGRATION SERVICES (Mar. 25, 2013),  https://tinyurl.com/y3werann

(dismissing appeal and denying L-1B petition where "[t]he evidence submitted fail[ed] to establish . . . that the beneficiary possesses specialized knowledge or that he has and will be employed in a specialized knowledge capacity with the petitioner in the United States").

72. **Cognizant's Application for B-1 Visas in Lieu of H-1B Visas:** Cognizant's representations on its visa applications that employees for whom it seeks a B-1 visa will travel to the U.S. only for permissible business purposes and not to perform billable work are material. This is because had Cognizant truthfully disclosed B-1 employees' anticipated work in the U.S. on their visa applications, the applications would be rejected, and the government would ban the individuals who had fraudulently obtained B-1 visas from entering the U.S., deeming these individuals "inadmissible." *See e.g.*, File No. [REDACTED] at 3, U.S. CITIZENSHIP AND IMMIGRATION SERVICES (Apr. 3, 2013), https://tinyurl.com/yxas5s3r (individual found inadmissible when "the applicant used a business visa for purposes not specified by its terms"); Matter of O-M-R- at 2, U.S. CITIZENSHIP AND IMMIGRATION SERVICES (Aug.9, 2017), https://tinyurl.com/y3tw2u6v (noting B-1 applicant "has been found inadmissible for fraud or misrepresentation, specifically for seeking admission to the United States in 2008 with a B-1 nonimmigrant business visa and concealing the fact that he had been working and intended to continue working in the United States without authorization"); *see also* Chart of USCIS Non-Precedent Decisions at 18-19 (Ex. 26) (listing examples of USCIS's denial or revocation of fraudulent B-1 visa petitions); Compl., Dkt. #1, *United States of America v. Infosys Ltd.*, No. 4:13-cv-634 (E.D. Tex. Oct. 30, 2013)[7]; Settlement Agreement, Dkt. #2, *United States of America v. Infosys Ltd.*, No. 4:13-cv-634 (E.D. Tex. Oct. 30, 2013).[8]

---

[7] *Available at* https://www.ice.gov/doclib/news/releases/2013/131030plano2.pdf.

[8] *Available at* https://www.ice.gov/doclib/news/releases/2013/131030plano.pdf.

73.     **Cognizant's Misrepresentation of the Wages to be Paid to its H-1B Visa Workers:**  Cognizant has knowingly and repeatedly mispresented the salary to be paid to its H-1B visa workers in order to avoid having these visa applications rejected.  Because USCIS consistently denies H-1B visa petitions that fail to list the proper wage rate for the recipient, Cognizant was well aware that its visa petitions would be denied had it disclosed its fraudulent underpayment on the visa applications.  *See e.g*., MATTER OF G-H-P-, INC. at 12, U.S. CITIZENSHIP AND IMMIGRATION SERVICES (Oct. 31, 2018), https://tinyurl.com/yxsqjysv (denying H-1B petition and noting "the Petitioner was required to provide at the time of filing an LCA certified for the correct prevailing wage in order for it to be found to correspond to the petition. To permit otherwise may result in a petitioner paying a wage lower than that required by section 212(n)(l)(A) of the Act, 8 U.S.C. § 1 182(n)(l)(A)"); File No. [REDACTED] at 11, U.S. CITIZENSHIP AND IMMIGRATION SERVICES (May 26, 2015),  https://tinyurl.com/y479m8ro (dismissing appeal of H-1B visa denial where proffered wage did not comply with the prevailing wage and the "attested salary . . . on the Form I-129 f[ell] well below that required by law for the position of Software Developer, Application"); *see also* Chart of  USCIS Non-Precedent Decisions at 9-17 (Ex. 26) (listing examples of USCIS's denial of H-1B visa petitions for failure to pay proper wage rate).

## CAUSES OF ACTION

### COUNT I
### (Violations of the False Claims Act)
### (31 U.S.C. § 3729)

74.     Relator re-alleges and incorporates the foregoing paragraphs by reference as if fully set forth herein.

75.     Cognizant has knowingly presented, or caused to be presented, to employees of the United States, false and fraudulent claims for property or approval, in violation of 31 U.S.C. § 3729(a)(1)(A).  Cognizant has also knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim, in violation of 31 U.S.C. § 3729(a)(1)(B).  Cognizant has further knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government,  or knowingly concealed  or knowingly and  improperly  avoided  or  decreased an obligation to pay or transmit money or property to the Government in violation of 31 U.S.C. § 3729(a)(1)(G).

76.     Cognizant, by and through its officers, agents, and employees authorized and ratified all the violations of the False Claims Act committed by its various officers, agents, and employees.

77.     Cognizant's conduct has deprived the government of its interest in tens of thousands of H-1B, L-1, and B-1 visas.  The fraudulently obtained H-1B and L-1 visas should have rightfully been awarded to individuals seeking non-speculative work in the United States. Cognizant's conduct has also deprived the government of significant visa application filing fees each time the company improperly applied for an L-1 or B-1 visa for a foreign employee who traveled to the U.S. to perform work for which an H-1B visa should have been sought (resulting in a loss of $1,000 or $6,300 to the government for each fraudulent L-1 and B-1 visa application, respectively).  Cognizant's fraudulent conduct has further deprived the government of substantial tax revenue because Cognizant consistently underpays its thousands of its H-1B visa workers utilized in the U.S. each year.  Given Cognizant's heavy reliance on H-1B visa workers in staffing U.S. positions, the lost tax revenue suffered by the government is considerable.  Thus, the U.S.

government has suffered millions of dollars in lost visa application fees and tax revenue — damages which continue to accrue.

78.     For each False Claims Act violation, Cognizant is subject to penalties of up to $10,000 (for false claims made before November 3, 2015) and up to $22,363 (for false claims made on or after November 3, 2015) for each improper act and three times the amount of damages sustained by the government.  These civil penalties are mandatory.  *See* 31 U.S.C. § 3729(a)(1)(G); S. Rep. No. 96-615 at 2 & n.4 (1980) ("The imposition of this forfeiture is automatic and mandatory for each claim which is found to be false.  The United States is entitled to recover such forfeitures solely upon proof that false claims were made, without proof of any damages. . . . The Committee does not intend that the amount of forfeiture recovery be left to the discretion of the district court.  Rather, for each false claim, a forfeiture shall be imposed.").[9]

## PRAYER FOR RELIEF

WHEREFORE, Relator prays that the Court enter judgment against Cognizant, and in favor of the United States and Relator as follows:

1.  A declaratory judgment that the practices complained of herein are unlawful and violate 31 U.S.C. § 3729;

2.  Imposition of the maximum amount of civil penalties permitted for each of Cognizant's False Claims Act violations;

---

[9] *See also S.* Rep. No. 99-345 at 8 (1986) ("The imposition of this forfeiture is automatic and mandatory for each claim which is found to be false.  The United States is entitled to recover such forfeitures solely upon proof that false claims were made, without proof of any damages."); *id.* at 17 ("The Committee reaffirms the apparent belief of the act's initial drafters that defrauding the Government is serious enough to warrant an automatic forfeiture rather than leaving fine determinations with district courts, possibly resulting in discretionary nominal payments."); *United States v. Miller*, 645 F.2d 473, 475-76 & n.4 (5th Cir. 1982) ("the knowing submission of a false claim to the government is sufficient for the levying of the statutory forfeiture penalty" even where a complaint does not allege damages to the government).

3. Civil penalties in the amount of three times the actual damages suffered by the federal government as a result of Cognizant's actions;

4. A permanent injunction against Cognizant and its officers, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in unlawful policies, practices, customs, and usages set forth herein;

5. Relator seeks a fair and reasonable amount of any award for his contribution to the Government's investigation and recovery pursuant to 31 U.S.C. §§ 3730(b) and (d) of the False Claims Act, plus interest.

6. Award all reasonable attorneys' fees, expert witness fees, expenses, and costs of this action;

7. Pre- and post-judgment interest; and

8. Such other relief on behalf of the Relator and/or the United States of America as this Court deems just and appropriate.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.


Dated: January 27, 2021

/s/Jonathan Rudnick
Jonathan Rudnick, Esq.
The Law Office of Jonathan
Rudnick LLC
788 Shrewsbury Avenue, Suite 204
Tinton Falls, NJ 07724
(732) 842-2070
(732) 879-0213 (Fax)
jonr@ronrudlaw.com

*Attorney for Relator*


OF COUNSEL:

Daniel A. Kotchen
Daniel L. Low
Matthew J. Henken
Lindsey M. Grunert

KOTCHEN & LOW LLP
1745 Kalorama Road NW, Suite 101
Washington, DC 20009
(202) 471-1995
(202) 280-1128 (Fax)
dkotchen@kotchen.com
dlow@kotchen.com
mhenken@kotchen.com
lgrunert@kotchen.com