UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| JEAN-CLAUDE FRANCHITTI, *Plaintiff*, v. COGNIZANT TECHNOLOGY SOLUTIONS CORPORATION et al., *Defendants*. | Civil Action No. 3:17-cv-06317 MEMORANDUM AND ORDER |

This case is before the Court on Defendant's motion to dismiss Plaintiff's amended qui tam complaint. (ECF No. 18). The Court heard oral argument on July 20, 2021. For the reasons that follow, Defendant's motion is granted in part and denied in part.

BACKGROUND

**A. Facts**

Plaintiff Jean-Claude Franchitti ("Plaintiff" or "Franchitti") is a former employee of Defendants Cognizant Technology Solutions Corporation and Cognizant Technology Solutions U.S. Corporation[1] ("Defendant" or "Cognizant"). Cognizant provides technology services to its corporate clients on an individual project basis, as many of its clients do not have in-house IT departments. (Am. Compl. ¶ 15).

Many of Cognizant's employees are foreign workers, for whom Cognizant must apply for visas when they travel to the United States to work on projects. (*Id.* ¶¶ 18-19). The three primary types of visas Cognizant secures for its foreign workers are H-1B, L-1, and B-1. (*Id.* ¶

---

[1] Cognizant Technology Solutions Corporation is the parent company of Cognizant Technology Solutions U.S. Corporation. (Am. Compl. ¶ 7, ECF No. 17).

1

19).  Because the distinctions between those visas are at the heart of this case, a brief description of each follows.

    **i.**    **H-1B Visas**

H-1B visas are intended for temporary, specialized labor.  8 C.F.R. § 214.2(h)(1).  When an employer applies for an H-1B visa, it must state, *inter alia*, the place, start date, and end date of the worker's employment.  20 C.F.R. § 655.730(c)(4).  The employment must be non-speculative – that is, the position must exist at the time the application is filed – and the foreign worker's wages must be the same as other workers performing the same or similar duties in the marketplace.  20 C.F.R. § 655.731(a); USCIS, Policy Mem. 3 (2020), https://www.uscis.gov/sites/default/files/ document/memos/PM-602-0114_ITServeMemo.pdf; *Combatting Fraud and Abuse in the H-1B Visa Program*, USCIS, https://www.uscis.gov/scams-fraud-and-misconduct/report-fraud/combating-fraud-and-abuse-in-the-h-1b-visa-program (last visited June 22, 2021); (*see also* ECF No. 17-26 (collecting cases)).  An H-1B visa recipient may work in the United States for up to three years, with an option to extend the work authorization for another three years.  *H-1B Specialty Occupations, DOD Cooperative Research and Development Project Workers, and Fashion Models*, USCIS, https://www.uscis.gov/working-in-the-united-states/temporary-workers/h-1b-specialty-occupations-dod-cooperative-research-and-development-project-workers-and-fashion (last visited June 22, 2021).

The United States awards 65,000 H-1B visas (plus 20,000 for applicants with at least a master's degree) through a highly competitive lottery system each year.[2]  *Id*.  Generally, the selection process begins in March and, if selected in the lottery, an H-1B visa recipient may start

---

[2] For context, USCIS received 308,613 H-1B visa applications for Fiscal Year 2022 and 274,237 applications for Fiscal Year 2021.  *H-1B Electronic Registration Process*, USCIS, https://www.uscis.gov/working-in-the-united-states/temporary-workers/h-1b-specialty-occupations-and-fashion-models/h-1b-electronic-registration-process (last visited June 22, 2021).

working in the United States in October of the same year.  *H-1B Electronic Registration Process*, USCIS, https://www.uscis.gov/working-in-the-united-states/temporary-workers/h-1b-specialty-occupations-and-fashion-models/h-1b-electronic-registration-process (last visited June 22, 2021).  While the cost of an H-1B application may vary depending on the type of employer, it would likely be about $6,460 for a large company with many foreign workers like Cognizant.  *See H and L Filing Fees for Form I-129, Petition for a Nonimmigrant Worker*, USCIS, https://www.uscis.gov/forms/all-forms/h-and-l-filing-fees-for-form-i-129-petition-for-a-nonimmigrant-worker (last visited June 22, 2021); *I-129, Petition for a Nonimmigrant Worker*, USCIS, https://www.uscis.gov/i-129 (last visited June 22, 2021); (*see also* Am. Compl. ¶ 25).

### ii. L-1 Visas

L-1 visas are intended for applicants who have worked for their employer abroad for at least one continuous year within the preceding three years, and will provide services to the same employer in the United States in a capacity that is managerial, executive, or involves specialized knowledge or expertise in the employer's operations.  8 C.F.R. § 214.2(l)(1).  Recipients of an L-1A or L-1B visa may work in the United States for a maximum of seven or five years, respectively, after extending the initial three-year period.  *L-1A Intracompany Transferee Executive or Manager*, USCIS, https://www.uscis.gov/working-in-the-united-states/temporary-workers/l-1a-intracompany-transferee-executive-or-manager (last visited June 22, 2021); *L-1B Intracompany Transferee Executive or Manager*, USCIS, https://www.uscis.gov/working-in-the-united-states/temporary-workers/l-1b-intracompany-transferee-specialized-knowledge (last visited June 22, 2021).  Unlike H-1B visas, L-1 visas do not have an annual cap, lottery system, or wage requirement.  *Id.*  Further, an employer like Cognizant would likely pay $5,460 per L-1 visa application.  *See H and L Filing Fees for Form I-129, Petition for a Nonimmigrant Worker*,

USCIS, https://www.uscis.gov/forms/all-forms/h-and-l-filing-fees-for-form-i-129-petition-for-a-nonimmigrant-worker (last visited June 22, 2021); *I-129, Petition for a Nonimmigrant Worker*, USCIS, https://www.uscis.gov/i-129 (last visited June 22, 2021); (*see also* Am. Compl. ¶ 28).

### iii. B-1 Visas

B-1 visas are intended for short-term visitors for business purposes, which can include attending a conference, consulting with business associates, negotiating a contract, and participating in short-term trainings. 8 C.F.R. § 214.2(b); *B-1 Temporary Business Visitor*, USCIS, https://www.uscis.gov/working-in-the-united-states/temporary-visitors-for-business/b-1-temporary-business-visitor (last visited June 22, 2021). A visitor on a B-1 visa may stay in the United States for up to six months, with the possibility of extending the stay for a maximum total of one year per trip. *Id.* Unlike recipients of L-1 and H-1B visas, a visitor on a B-1 visa is not authorized to work in the United States. *See* 8 C.F.R. § 214.2(b); *Visitor Visa*, U.S. Dep't of State, https://travel.state.gov/content/travel/en/us-visas/tourism-visit/visitor.html (last visited June 22, 2021). A B-1 visa application costs $160 and does not involve a lottery process. U.S. Dep't of State, *supra*.

Cognizant hired Franchitti as a Director in 2007 and promoted him to Assistant Vice President in 2011. (Am. Compl. ¶ 32). Franchitti alleges that, during the course of his employment, he observed several types of fraud in Cognizant's visa application procedures.

First, he alleges that Cognizant routinely applied for H-1B visas for future, prospective work. This allowed it to maintain a population of "travel ready" workers who could immediately travel to the United States when a labor need arose, thereby circumventing the unreliable, competitive, and time-consuming H-1B lottery process. (*Id.* ¶¶ 39-40). To secure these

prospective H-1B visas, Cognizant allegedly falsified job descriptions and projects in invitation letters which described the work that the "travel-ready" employees would perform in the United States.  (*Id.* ¶ 45).  Franchitti cites email correspondence and internal documents regarding this practice, in which he was pressured to participate.  (*Id.* ¶¶ 40-43; *see, e.g.*, ECF Nos. 17-4, 17-9, 17-11, 17-12, 17-16).  For example, he was asked to explain to team members Cognizant's need "to get associates visa-ready, so if a suitable opportunity arises in the US we can move quickly," (Am. Compl. ¶ 41), and to sign hundreds of fraudulent invitation letters, (*id.* ¶¶ 46-47).  When Franchitti raised concerns about these practices with his supervisor, the responsibility to sign invitation letters was transferred to another Cognizant employee.  (*Id.* ¶ 50).

  Second, Franchitti alleges that Cognizant routinely applied for L-1 and B-1 visas instead of H-1B visas to save money and avoid the H-1B lottery process.  (*Id.* ¶¶ 52-53).

  For its L-1 visa applications, Cognizant allegedly issued fraudulent invitation letters attesting to the managerial and/or specialized duties the visa recipients would perform – much of which was fabricated.  (*Id.* ¶ 54).  Franchitti alleges Cognizant's fraud was two-fold: (1) it improperly secured L-1 visas for future projects, and (2) the work the employees actually performed did not meet the criteria for an L-1 visa.  (*Id.* ¶¶ 53-55).

  In addition, Cognizant allegedly brought foreign workers to the United States on B-1 visas to perform billable work that required an H-1B visa.  (*Id.* ¶ 56).  Franchitti cites internal correspondence indicating that Cognizant knowingly approved B-1 visa holders to perform paid services in the United States, even though the B-1 visa does not authorize such work.  (*Id.* ¶ 57).

  Third, Franchitti alleges that Cognizant falsely certified that it would pay its H-1B employees the legally required wage rate when, in fact, it paid those employees substantially less than their colleagues who performed the same work but did not require visas.  (*Id.* ¶ 58).  He

5

asserts that keeping its employee expenses low allowed Cognizant to offer its customers a lower price and make more profit.  (*Id.* ¶¶ 59-60).

In sum, Franchitti argues the United States has been harmed by Cognizant's fraudulent practices because (1) it has been deprived of its interest in the visas and the ability to control their distribution in accordance with the law; (2) it was deprived of application fees when Cognizant improperly applied for L-1 and B-1 visas for work that required a more expensive H-1B visa; and (3) Cognizant's underpayment of its H-1B visa workers has deprived the United States of significant tax revenue by reducing the required amount of its payroll tax contributions.[3]  (*Id.* ¶¶ 63-65).  Each of those harms, he alleges, arose from Cognizant's submission of false certifications and false claims during the visa application process.  And, but for those false claims and false statements, Cognizant's visa applications would have been denied because its foreign workers were not eligible for the visas they received.  (*Id.* ¶¶ 68-73).

### B. Procedural History

Franchitti timely filed his original qui tam complaint on August 22, 2017 (ECF No. 1).  *See* 31 U.S.C. § 3731(b)(1).  The United States declined to intervene.  (ECF No. 4).  After Defendant moved to dismiss the complaint (ECF No. 16), Franchitti filed an amended complaint on January 27, 2021 (ECF No. 17).  Defendant filed the instant motion to dismiss on February 17, 2021.  (ECF No. 18).

### C. Venue & Jurisdiction

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3729.  Venue is proper in the District of New Jersey under 31 U.S.C. § 3732 and 28 U.S.C. §

---

[3] Franchitti does not allege a violation of the Internal Revenue Code – he submits that Cognizant complied with the tax laws by paying the requisite 7.65% in payroll taxes for each employee.  Rather, he asserts that if Cognizant paid its H-1B workers the legally required wage, its payroll tax contributions would have been significantly greater.  (*Id.* ¶ 65).

1391(b) because Cognizant's principal place of business and world headquarters are in Teaneck, New Jersey. (Am. Compl. ¶ 7). In addition, Franchitti alleges Cognizant's submission of fraudulent visa petitions and supporting documentation took place in New Jersey. (*Id.* ¶ 9).

## DISCUSSION

### A. Legal Standard

Federal Rule of Civil Procedure 12(b)(6) provides that an action may be dismissed for "failure to state a claim upon which relief can be granted." "In deciding a Rule 12(b)(6) motion, a court must take all allegations in the complaint as true and view them in the light most favorable to the plaintiff." *United States v. Loving Care Agency, Inc.*, 226 F. Supp. 3d 357, 362-63 (D.N.J. 2016). The plaintiff's factual allegations must give rise to a claim for relief that is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

When a complaint involves allegations of fraud, a plaintiff must meet the heightened pleading requirements of Rule 9(b) to state a claim under Rule 12(b)(6). *Foglia v. Renal Ventures Mgmt., LLC*, 754 F.3d 153, 155 (3d Cir. 2014). Under Rule 9(b), "a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). The purpose of Rule 9(b) is to "provide[ ] defendants with fair notice of the plaintiffs' claims." *Foglia*, 754 F.3d at 156. The Third Circuit has held that a plaintiff need only allege "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Id.* at 155-58.

> Courts in [the District of New Jersey] have found that a plaintiff may satisfy that requirement in one of two ways: (1) by pleading the date,

7

>place, or time of the fraud; or (2) using an alternative means of injecting precision and some measure of substantiation into their allegations of fraud.

*Loving Care Agency*, 226 F. Supp. 3d at 363 (quoting *Flanagan v. Bahal*, No. 12–cv–2216, 2015 WL 9450826, at *3 (D.N.J. Dec. 22, 2015)).

### B. False Claims Act

Private persons may bring a qui tam action on their own behalf and on behalf of the United States for a violation of the False Claims Act. 31 U.S.C. § 3730(b). In the present case, Franchitti alleges violations of 31 §§ 3729(a)(1)(A), (B), and (G), and seeks declaratory and injunctive relief, statutory civil penalties, and a monetary award and legal fees and costs for himself.

First, the Court must evaluate whether Franchitti's complaint sufficiently pleads a false claim or reverse false claim under 31 U.S.C. § 3729(a)(1)(A), (B), or (G). Then, the Court will address Defendant's arguments that Franchitti's complaint should be dismissed based on the public disclosure bar and/or tax bar. *See* 31 U.S.C. §§ 3729(d); 3730(e)(4)(A).

### C. Claims

Franchitti alleges Cognizant violated 31 U.S.C. §§ 3729(a)(1)(A) and (B) ("section (A)" and "section (B)") by knowingly submitting false documentation in connection with its H-1B, L-1, and B-1 visa applications, including fraudulent invitation letters and job descriptions.

A person violates section (A) if they "knowingly present[], or cause[] to be presented, a false or fraudulent claim for payment or approval." A person violates section (B) if they "knowingly make[], use[], or cause[] to be made or used, a false record or statement material to a false or fraudulent claim." In relevant part, a "claim" is "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to

8

the money or property, that-- (i) is presented to an officer, employee, or agent of the United States." 31 U.S.C. § 3729(b)(2)(A).  Franchitti's allegation that Cognizant violated 31 U.S.C. §§ 3729(a)(1)(A) or (B) requires the Court to construe a visa as "property" under the FCA's definition of "claim."

In *Cleveland v. United States*, 531 U.S. 12, 24 (2000), the Supreme Court held that video poker machine licenses did not fall within traditional concepts of property rights under the federal mail fraud statute, 18 U.S.C. § 1341.  The Court emphasized that the licenses have no economic or commercial value in the hands of the government but, rather, allow it to collect processing fees from license applications and "exclude applicants deemed unsuitable to run video poker operations." *Cleveland*, 531 U.S. at 23-24.  The Court held that "these intangible rights of allocation, exclusion, and control amount to no more and no less than Louisiana's sovereign power to regulate" and that "[s]uch regulations are paradigmatic exercises of the States' traditional police powers." *Id.* at 23.  Applying *Cleveland* in the context of the FCA, the District of Delaware held that fishing licenses are not "property" because they do not "exist 'independent of the regulatory regime.'" *United States v. Majestic Blue Fisheries, LLC*, 196 F. Supp. 3d 436, 444 (D. Del. 2016).[4]

The analyses in *Cleveland* and *Majestic* are instructive.  Like a license, a visa has no value to the government beyond the revenue stream from application fees.  Rather, "[i]t licenses, subject to certain conditions, engagement in pursuits that private actors may not undertake without official authorization." *Cleveland*, 531 U.S. at 13.  For example, foreign workers may not enter the United States or perform paid services unless they meet specific criteria and comply

---

[4] By contrast, a veteran's fraudulent affidavit and application for hospitalization were considered a claim for money or property under the FCA because the value of the medical services, equipment, and medicines he received had a tangible financial value. *Alperstein v. United States*, 291 F.2d 455 (5th Cir. 1961).  *But see United States v. Borth*, 266 F.2d 521, 523 (10th Cir. 1959) (reaching the opposite conclusion on similar facts).

with immigration regulations, and the United States controls the number of visas and the process by which they are issued. Such a "purely regulatory" scheme does not invoke traditional property rights. *Majestic*, 196 F. Supp. 3d at 444 (quoting *Cleveland*, 531 U.S. at 21-22).

Because the Court finds that a visa is not property, Franchitti has failed to allege a false or fraudulent "claim" under either 31 U.S.C. §§ 3729(a)(1)(A) or (B). As a result, the Court shall grant Defendant's motion to dismiss as to all paragraphs of Franchitti's complaint that allege a violation of 31 U.S.C. §§ 3729(a)(1)(A) or (B).

### D. Reverse False Claims

Franchitti alleges Cognizant violated 31 U.S.C. § 3729(a)(1)(G) ("section (G)") when it knowingly applied for B-1 and L-1 visas instead of the more appropriate H-1B visas, thereby decreasing its financial obligation to the government. A person is liable for a reverse false claim under section (G) when they

> knowingly make[], use[], or cause[] to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.

31 U.S.C. § 3729(a)(1)(G).

To state a claim under this section, Franchitti must show that there was an "obligation" as defined by the FCA. "[T]he term 'obligation' means an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." 31 U.S.C. § 3729(b)(3). "[F]or a reverse FCA claim, the definition of an 'obligation' refers to one existing at the time of the improper conduct to pay the Government funds." *United States ex rel. Petras v. Simparel, Inc.*, 857 F.3d 497, 506 (3d Cir. 2017). The

10

obligation must not be contingent – that is, it cannot be solely dependent on future, hypothetical, or discretionary events, such as the obligation to pay accrued dividends upon a company's liquidation or the board's declaration of dividends, *id.* at 505, or to pay a statutory fine for a violation that has not yet been prosecuted by the government, *U.S. ex rel. Bain v. Georgia Gulf Corp.*, 386 F.3d 648, 653 (5th Cir. 2004).

There is little case law on this precise issue. In one factually similar case, the relator argued that "[b]ecause Defendants falsely obtained cheaper [B-1] visas, they avoided an obligation to pay the government the higher fees associated with the more expensive unskilled-worker visa." *Lesnik v. Eisenmann SE*, 374 F. Supp. 3d 923, 939 (N.D. Cal. 2019) (alterations in original). The court rejected that argument, holding that "there was no obligation to pay the government for a petition-based visa because no visa application for a petition-based visa was ever actually submitted." *Id.* at 940. In other words, the employer fulfilled its obligation by paying the correct fee for the visa it obtained, even if it knew that visa did not authorize the type of work its employee performed.

Other courts to interpret "obligation" under the FCA have focused on whether the defendant had a contractual, statutory, or regulatory obligation. *See, e.g.*, *United States ex rel. Customs Fraud Investigations, LLC. v. Victaulic Co.*, 839 F.3d 242 (3d Cir. 2016); *United States v. Pemco Aeroplex, Inc.*, 195 F.3d 1234 (11th Cir. 1999).

In *Pemco*, the court found that the defendant decreased its obligation to pay money to the government by misrepresenting the true value of the equipment it purchased from the Air Force. 195 F.3d at 1236-37. Pursuant to regulation and a pre-existing contract, the defendant was required to submit an inventory schedule and dispose of excess government property in its possession. *Id.* at 1237-38. By submitting incorrect stock numbers in its inventory schedule, the

11

defendant avoided accounting for the full value of the equipment and purchased it from the government at a substantially below-market price. *Id.* at 1236.

In *Victaulic*, the defendant imported millions of pounds of improperly marked pipe fittings without reporting that they were improperly marked, thereby avoiding the 10% marking duty required by the Tariff Act of 1930. 839 F.3d at 245-46. Noting the expanded definition of "obligation" resulting from the FCA's 2009 revision,[5] the Third Circuit held that the defendant was liable under the reverse false claims provision of the FCA because it had an obligation to pay the marking duty – which accrued at the time it imported the improperly marked goods – and it knowingly and improperly avoided that obligation. *Id.* at 254-55.

Just as the defendant in *Pemco* submitted false records to pay less than the true value of the airplane equipment, Cognizant submitted false statements about the nature of its employees work to pay lower visa application fees. And, like the marking duty in *Victaulic*, Cognizant's obligation to pay the correct visa application fee accrued upon its submission of the visa application. Cognizant's obligation was governed by the USCIS regulatory scheme but, unlike *Pemco* and *Victaulic*, there is no statute or pre-existing contract at issue here.

A plain language reading of the statute suggests that Cognizant had an obligation to pay the appropriate fee for the privileges associated with its desired visa. This could be characterized

---

[5] "The reverse false claims provision of the FCA was revised as part of the Fraud Enforcement and Recovery Act of 2009 (FERA)." *Id*. at 253.

> The FERA made two substantial changes. First, it added to the reverse false claims provision the phrase "or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." Second, it defined an "obligation" as "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment."

*Id*. Those changes "broadened the scope to which reverse false claims liability would attach," following the narrow interpretation of "obligation" in *American Textile Manufacturers Institute, Inc. v. The Limited, Inc.*, 190 F.3d 729 (6th Cir. 1999). *Id.* at 253-54.

as an "implied contractual" or "fee-based" relationship under 31 U.S.C. § 3729(b)(3). By paying for L-1 and B-1 visas but directing its employees to perform work that required the more expensive H-1B visa, Cognizant decreased – and made false statements material to – its obligation to pay money to the government under 31 U.S.C. § 3729(a)(1)(G). The internal email correspondence submitted by Franchitti is plausibly sufficient to allege that Cognizant committed this violation knowingly. Finally, Cognizant's false statements are material because if it accurately represented the nature of its employees' work, its visa applications would likely have been rejected or its employees' visas revoked, consistent with USCIS policy and practice. (*See, e.g.*, ECF No. 17-26 at 18-19). The details and documentation of Cognizant's alleged fraud have been asserted with sufficient particularity to meet the heightened pleading requirements under Fed. R. Civ. P. 9(b).

For the foregoing reasons, Franchitti has sufficiently stated a reverse false claim under 31 U.S.C. § 3729(a)(1)(G), and Defendant's motion to dismiss shall be denied as to the paragraphs of the complaint that allege a violation of that section.

### E. Public Disclosure Bar

The False Claims Act contains a public disclosure bar provision, which provides:

> The court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed--
> (i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party;
> (ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or
> (iii) from the news media,
>
> unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

31 U.S.C. § 3730(e)(4)(A).

In interpreting that provision, the Third Circuit has stated that "[w]here the fraud has been publicly disclosed — either because the public documents set out the allegation of fraud itself [Z] or its essential elements [X+Y] — a relator's claim will be barred so long as it is '"supported by" or "substantially similar to" [the] public disclosures.'" *United States v. Omnicare, Inc.*, 903 F.3d 78, 83–84 (3d Cir. 2018) (alterations in original) (quoting *United States ex rel. Zizic v. Q2Administrators, LLC*, 728 F.3d 228, 237 (3d Cir. 2013)).  The public disclosures must do more than "merely indicate the possibility that such a fraud could be perpetrated in the [relevant] industry." *Omnicare*, 903 F.3d at 86.  However, the defendant need not be specifically named as long as it is directly identifiable from the public disclosures. 728 F.3d at 238.

Other circuits have held that the public disclosures must set the government "on the trail" of the defendant – that is, alert the government to the possibility of the defendant's fraud.  *See, e.g.*, *United States ex rel. Reed v. KeyPoint Gov't Sols.*, 923 F.3d 729, 751 (10th Cir. 2019); *United States v. CSL Behring, L.L.C.*, 855 F.3d 935, 944 (8th Cir. 2017); *Advocates for Basic Legal Equal., Inc. v. U.S. Bank, N.A.*, 816 F.3d 428, 431 (6th Cir. 2016); *United States ex rel. Jamison v. McKesson Corp.*, 649 F.3d 322, 329, 330 (5th Cir. 2011); *U.S. ex rel. Baltazar v. Warden*, 635 F.3d 866, 868 (7th Cir. 2011); *United States v. Alcan Elec. & Eng'g, Inc.*, 197 F.3d 1014, 1019 (9th Cir. 1999).

Even if the public disclosure bar is triggered, a relator may proceed with his or her FCA action if he or she is "an original source of the information" that was publicly disclosed.  31 U.S.C. § 3730(e)(4)(A); *see also Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 470-71 (2007).  Pursuant to the False Claims Act:

> "[O]riginal source" means an individual who either (i) prior to a public disclosure under subsection (e)(4)(a), has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or (2) who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section.

31 U.S.C. § 3730(e)(4)(B).

Defendant argues that Franchitti's complaint is barred because certain news articles, reports, and other documents attached to its motion to dismiss publicly disclose the substance of Franchitti's allegations. (*See* Moving Br. Exs. 1-7). Although the applicability of the public disclosure bar must be resolved early in the litigation, it is difficult to draw a conclusion at this time based on the present record. Further, many courts that ruled on this issue did so after some discovery had been conducted, or a more complete factual record had been established. *See, e.g.*, *United States ex rel. Silver v. Omnicare, Inc.*, 222 F. Supp. 3d 391 (D.N.J. 2016), *rev'd and remanded sub nom. United States v. Omnicare, Inc.*, 903 F.3d 78 (3d Cir. 2018); *United States Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 69 F. Supp. 3d 416 (D. Del. 2014), *rev'd and remanded sub nom. U.S. ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294 (3d Cir. 2016). At this time, the Court does not have enough information to determine whether the public disclosure bar applies and, if so, whether Franchitti qualifies as an original source. The parties should conduct discovery on this issue as the first order of business.

### F. Tax Bar

The FCA contains a "tax bar" provision which states that the Act "does not apply to claims, records, or statements made under the Internal Revenue Code of 1986." 31 U.S.C. § 3729(d). The tax bar arises from Congress' intent that the Internal Revenue Service (IRS) have exclusive jurisdiction over "the collection or recovery of taxes, or of any fine, penalty, or

15

forfeiture." *See* 26 U.S.C. § 7401; *U.S. ex rel. Lissack v. Sakura Glob. Cap. Mkts., Inc.*, 377 F.3d 145 (2d Cir. 2004).

The Second Circuit has articulated a two-part test to determine if the tax bar is triggered: (1) whether the case depends entirely on a purported violation of the Tax Code; and (2) whether the IRS has authority to recover the precise amounts the plaintiff is seeking. *Lissack*, 377 F.3d at 153. The court emphasized that the application of the tax bar is not limited to cases that seek to recover taxes but, rather, depends on whether the claim "rises or falls on finding a violation of the Tax Code." *Id.* at 153-154.

Under the first prong, the *Lissack* Court found

> the fraud was the failure to conform to IRS rules for maintaining tax-exempt status of advance refunding bonds. The municipalities' purchase of SLGS bonds and Treasury securities thus "harmed" the Government only because the Tax Code's anti-arbitrage rules required that the municipalities purchase different amounts of those securities than they actually did.

*Id.* at 154. Under the second prong, "[b]oth the IRS's involvement in policing the sort of fraud alleged by Lissack and the IRS's ability to recover for the Government the precise amounts that Lissack seeks in his FCA action indicate to us that Lissack's claims fall within the scope of the Tax Bar." *Id.* at 156.

The Court must determine whether Franchitti's claim is barred to the extent that he argues Defendant deprived the United States of income tax revenue by underpaying its H-1B visa employees. For the following reasons, the Court finds that neither prong of the *Lissack* test has been met.

First, the immigration regulatory scheme, not the Tax Code, regulates the wages of foreign workers. Pursuant to the Immigration and Nationality Act:

16

> (1) No alien may be admitted or provided status as an H-1B nonimmigrant in an occupational classification unless the employer has filed with the Secretary of Labor an application stating the following:
> (A) The employer--
> (i) is offering and will offer during the period of authorized employment to aliens admitted or provided status as an H-1B nonimmigrant wages that are at least--
> (I) the actual wage level paid by the employer to all other individuals with similar experience and qualifications for the specific employment in question, or
> (II) the prevailing wage level for the occupational classification in the area of employment,
>
> whichever is greater, based on the best information available as of the time of filing the application . . . .

8 U.S.C. § 1182(n)(1)(A). The formula to calculate the prevailing wage is set forth in 8 U.S.C. § 1182(p).

The Secretary of Labor is responsible for investigating and remedying violations of the wage requirement provision. 8 U.S.C. § 1182(n)(2)(A). For example:

> If the Secretary finds, after notice and opportunity for a hearing, that an employer has not paid wages at the wage level specified under the application and required under paragraph (1), the Secretary shall order the employer to provide for payment of such amounts of back pay as may be required to comply with the requirements of paragraph (1), whether or not a penalty under subparagraph (C) has been imposed.

8 U.S.C. § 1182(n)(2)(D). *See also* 8 U.S.C. § 1182(n)(2)(G).

Thus, while underpaying H-1B workers deprives the IRS of income tax revenue, it does not appear to violate any tax law or regulation. On the contrary, it is a direct violation of the Immigration and Nationality Act. Other courts have applied the tax bar when a relator's FCA claim was based on a specific provision of the tax code, and refused to apply it when the claim was based on a violation of a different statutory scheme. *See U.S. ex rel. Calilung v. Ormat*

17

*Indus., Ltd.*, No. 3:14-CV-00325-RCJ, 2015 WL 1321029, at *13-14 (D. Nev. Mar. 24, 2015); *U.S. ex rel. Barber v. Paychex, Inc.*, No. 09-20990-CIV, 2010 WL 2836333, at *7 (S.D. Fla. July 15, 2010), *aff'd sub nom. Barber v. Paychex Inc.*, 439 F. App'x 841 (11th Cir. 2011); *Patriot Tax Int'l, LLC v. Diaz*, No. CIVA 07-262-JBC, 2008 WL 2705450, at *4 (E.D. Ky. July 3, 2008). However, some courts have taken a broader approach, holding that the tax bar precludes any FCA claim based on tax avoidance or failure to pay wages. *See Lesnik v. Eisenmann SE*, No. 16-CV-01120-LHK, 2018 WL 4700342, at *5-6 (N.D. Cal. Oct. 1, 2018); *Ananiev v. Freitas*, 37 F. Supp. 3d 297 (D.D.C.), *aff'd*, 587 F. App'x 661, 307 (D.C. Cir. 2014).

The second element of the *Lissack* test is whether the IRS could have uncovered and prosecuted the violation. Here, it is not clear that the IRS can discern when employees are being paid less than the wage required by immigration law. While numerous IRC and treasury regulations pertain to foreign workers, their purpose is to establish how foreign workers should be taxed – not how they should be paid. *See, e.g.*, 26 C.F.R. § 31.3121(b)(19)-1; 26 C.F.R. § 1.871–9, Treas. Reg. § 1.871–9; 26 C.F.R. § 1.1–1, Treas. Reg. § 1.1–1; 26 U.S.C. § 871, I.R.C. § 871. Defendant has not provided information that would allow the Court to conclude the IRS knows (1) each employee's immigration status, (2) the wage requirements for each type of visa, and (3) the prevailing wage for each role within each industry. Further, as previously discussed, the responsibility for investigating and penalizing violations of the wage requirement rests with the Secretary of Labor.

In sum, because Franchitti's claims concern a violation of the immigration – not tax – laws, and because the Secretary of Labor – not the IRS – is the authority tasked with enforcing the prevailing wage provision, the tax bar does not apply here.

<u>CONCLUSION</u>

Franchitti has sufficiently pleaded a reverse false claim under section (G) of the FCA. Therefore, Defendant's motion to dismiss is denied as to the paragraphs of the complaint alleging violations of 31 U.S.C. § 3729(a)(1)(G).  Because Franchitti has not sufficiently pleaded a claim under sections (A) and (B) of the FCA, Defendant's motion to dismiss is granted as to the paragraphs of the complaint alleging violations of 31 U.S.C. §§ 3729(a)(1)(A) and (B).

<u>ORDER</u>

**THIS MATTER** having come before the Court on Defendant's motion to dismiss the Relator's amended complaint (ECF No. 18); and the Court having carefully reviewed and taken into consideration the submissions of the parties, as well as the arguments and exhibits therein presented; and for good cause shown; and for all of the foregoing reasons,

**IT IS** on this 17th day of August 2021,

**ORDERED** that Defendant's motion to dismiss (ECF No. 18) is **granted in part** and **denied in part,** as follows:

(1) Defendant's motion is **granted** as to the paragraphs alleging violations of 31 U.S.C. § 3729(a)(1)(A) and (B), and

(2) Defendant's motion is **denied** as to the paragraphs alleging violations of 31 U.S.C. § 3729(a)(1)(G); and it is further

**ORDERED** that the parties should confer and communicate with the Magistrate Judge within 30 days to conduct discovery concerning the application of the public disclosure bar provision; and it is further

**ORDERED** that Defendant's motion to dismiss the original complaint (ECF No. 16) is dismissed as moot.

s/*Peter G. Sheridan*
PETER G. SHERIDAN, U.S.D.J.
